# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ONTARIO PROVINCIAL COUNCIL OF CARPENTERS' PENSION TRUST FUND, POLICE & FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, AND NORFOLK COUNTY RETIREMENT SYSTEM, Derivatively on Behalf of WALMART INC., | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2021-0827-JTL |
| S. ROBSON WALTON, GREGORY B. PENNER, STEUART WALTON, TIMOTHY P. FLYNN, THOMAS W. HORTON, MARISSA A. MAYER, DOUG MCMILLON, STEVEN S. REINEMUND, PHYLLIS HARRIS, and JAY JORGENSEN, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| WALMART INC., | ) ) ) | |
| Nominal Defendant. | ) | |

## OPINION ADDRESSING DEFENDANTS' MOTION TO DISMISS ON THE BASIS OF LACHES

Date Submitted: January 13, 2023
Date Decided: April 12, 2023

Gregory V. Varallo, Mae Oberste, & Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Mark Lebovitch & Edward G. Timlin, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Leslie R. Stern, Nathaniel L. Orenstein, & Steven L. Groopman, BERMAN TABACCO, Boston, Massachusetts; *Counsel for Police & Fire Retirement System of the City of Detroit and Norfolk County Retirement System.*

Ned Weinberger & Mark Richardson, LABATON SUCHAROW LLP, Wilmington, Delaware; David MacIsaac, LABATON SUCHAROW LLP, New York, New York; *Counsel for The Ontario Provincial Council of Carpenters' Pension Trust Fund.*

Raymond J. DiCamillo & John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Sean M. Berkowitz & Nicholas J. Siciliano, LATHAM & WATKINS LLP, New York, New York; Andrew W. Stern & Charlotte K. Newell, SIDLEY AUSTIN LLP, New York, New York; William M. Regan & Allison M. Wuertz, HOGAN LOVELLS US LLP, New York, New York; Frank R. Volpe, SIDLEY AUSTIN LLP, Washington, District of Columbia; *Counsel for Defendants and Nominal Defendant.*

**LASTER, V.C.**

Walmart Inc. operates over 5,000 pharmacies that dispense prescription opioids. Until April 2018, Walmart acted as a wholesale distributor of prescription opioids for its pharmacies. Walmart has incurred significant liabilities due to its involvement with prescription opioids.

The plaintiffs are stockholders who seek to hold accountable the fiduciaries whom they say caused Walmart to suffer harm. They maintain that the directors and officers of Walmart breached their fiduciary duties by (i) knowingly causing Walmart to fail to comply with its obligations under the federal Controlled Substances Act and its implementing regulations (collectively, the "Controlled Substances Act") when acting as a dispenser of opioids through its pharmacies (the "Pharmacy Issues"), (ii) knowingly causing Walmart to fail to comply with its obligations under the Controlled Substances Act when acting as a distributor of opioids (the "Distributor Issues"), and (iii) knowingly causing Walmart to fail to comply with its obligations under a settlement with the U.S. Drug Enforcement Agency (the "DEA Settlement Issues").

For each set of issues, the plaintiffs advance three species of claims: an Information-Systems Claim, a Red-Flags Claim, and a *Massey* Claim. The Information-Systems Claim asserts that Walmart's directors and officers knew they had an obligation to establish information systems sufficient to enable them to monitor Walmart's compliance with the Controlled Substances Act and the DEA Settlement, yet consciously failed to make a good faith effort to fulfill that obligation. The Red-Flags Claim asserts that a steady stream of red flags put Walmart's directors and officers on notice of its noncompliance, yet the directors and officers consciously ignored them. The *Massey* Claim asserts that Walmart

did not comply with the Controlled Substances Act and the DEA Settlement because its officers and directors made a conscious decision to prioritize profits over legal compliance, thereby choosing to violate the law.

In their lead argument for dismissal, the defendants argue that all of the plaintiffs' claims are untimely. Applying the principles set forth in *Lebanon County Employees' Retirement Fund v. Collis*, 287 A.3d 1160 (Del. Ch. 2022), this decision rejects that argument.

In *Collis*, the court evaluated three different methods of measuring the time when a claim accrues: the discrete act approach, the continuing wrong approach, and the separate accrual approach. The *Collis* decision applied the separate accrual approach to a Red-Flags Claim and assumed that it would govern a *Massey* Claim, while holding out the possibility that because of the seriousness of a *Massey* Claim, the continuing wrong approach might apply. Addressing an issue of first impression, this decision holds that the separate accrual approach governs an Information-Systems Claim.

To apply the separate accrual approach, a court picks a lookback date by identifying when the plaintiff began pursuing its claims. Usually, that will be when the plaintiff filed suit, but when a plaintiff has engaged in diligent efforts to obtain books and records, the lookback date can be tied to those efforts. In this case, the plaintiffs filed suit on September 27, 2021, but they started making diligent efforts to pursue books and records on May 4, 2020. That is the lookback date for this case.

The next step in the separate accrual approach is to measure backward from the lookback date using the statute of limitations for a closely analogous legal claim. The result is the actionable period. For a claim for breach of fiduciary duty, the analogous statute of limitations is three years. Measuring back from the lookback date of May 4, 2020, results in an actionable period that started on May 4, 2017.

The third step in the separate accrual approach is to determine whether any of the ongoing conduct that gives rise to the claim occurred during the actionable period. If so, then the claim is timely. If not, then the court must analyze any tolling doctrines that the plaintiffs have asserted.

The timeliness analysis for the Pharmacy Issues is straightforward. In August 2022, a federal judge entered an injunction order requiring Walmart to remediate deficient controls and reporting systems. Then, as part of a nationwide settlement that Walmart agreed to in November 2022, Walmart agreed to implement extensive procedures and controls. Those events support a reasonable inference that the Pharmacy Issues continued throughout the actionable period. The plaintiffs' claims based on the Pharmacy Issues are timely.

The timeliness analysis for the Distributor Issues is equally straightforward. Management decided to exit that business in November 2017, and the winddown was over by April 2018. The actionable period extends backward to May 2017, so there is overlap between the wrongdoing and the actionable period. Just as a filing under a discrete act

3

approach is timely if it beats the statute of limitations by one day, so too is a plaintiff's suit timely under the separate accrual approach if some overlap exists between the conduct and the actionable period. The plaintiffs' claims based on the Distributor Issues are timely.

The analysis is more complex for the DEA Settlement Issues. The DEA Settlement expired on March 11, 2015, so any violations of the settlement ceased on that date. The actionable period only extends backward to May 4, 2017, so there is no overlap between the wrongdoing and the actionable period. Absent tolling, the plaintiffs' claims based on the DEA Settlement Issues are untimely.

Tolling doctrines can push back the starting date of the actionable period, which may enable a plaintiff to assert an otherwise untimely claim. The plaintiffs have invoked three tolling doctrines: equitable tolling, inherently unknowable injury, and fraudulent concealment.

Equitable tolling applies because the defendants are fiduciaries, charged with acting in the best interests of the corporation and its stockholders. As stockholders, the plaintiffs were entitled to rely on the presumption that their fiduciaries were acting loyally, in good faith, and with due care. The pleading-stage record supports an inference that there was no information available about the DEA Settlement Issues until March 2020. During the intervening period, Walmart issued disclosures indicating that the directors and officers were fulfilling their fiduciary duties. There was no indication that Walmart's directors and

4

officers had breached their fiduciary duties by consciously disregarding the compliance requirements built into a settlement agreement with its primary regulator.

Tolling cannot preserve an otherwise untimely claim after the point of inquiry notice. After that, a plaintiff must pursue the claim within a reasonable time. The defendants point to the barrage of cases filed against Walmart in 2016 and 2017, later consolidated into a multidistrict litigation (the "Opioid MDL") and argue that those lawsuits put stockholders on inquiry notice that Walmart might not be complying with its obligations under the Controlled Substances Act. The defendants claim that by providing reason to suspect that Walmart might not be complying with its obligations under the Controlled Substances Act, those lawsuits also put stockholders on inquiry notice that Walmart might not be complying with other legal obligations, such as the compliance requirements built into an undisclosed settlement agreement with its primary regulator that was in effect from March 2011 until March 2015.

The court cannot determine at the pleading stage that the filing of the cases that led to the Opioid MDL put stockholders on inquiry notice about the DEA Settlement Agreement. For lawsuits to suggest potential problems at a company is one thing. It is something else entirely to argue that those lawsuits should have suggested to stockholders that Walmart might have entered into an undisclosed settlement agreement with its primary regulator and had failed to comply with its obligations under that settlement agreement.

The court can only apply the defense of laches at the pleading stage if it is clear from the face of the complaint that the claims are time-barred. Because of the uncertainties surrounding inquiry notice about the DEA Settlement Issues, the court cannot determine at the pleading state that those claims are time-barred.

The defendants' motion to dismiss on the basis of laches is denied. The claims based on the Pharmacy Issues and the Distributor Issues are timely. The claims based on the DEA Settlement Issues may be timely because of equitable tolling, subject to further proceedings on the subject of inquiry notice.

## I.     FACTUAL BACKGROUND

The facts are drawn from the operative complaint, the documents it incorporates by reference, and public documents that are subject to judicial notice.[1] At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences, including inferences drawn from the documents.

---

[1] The complaint incorporates by reference documents produced in federal proceedings involving Walmart. The complaint also incorporates documents filed with the U.S. Securities and Exchange Commission (the "SEC"). The court may consider both sets of documents at this stage of the proceedings.

Citations in the form "Compl. ¶ —" refer to the paragraphs of the operative complaint. Citations in the form "Ex. [number] at —" refer to exhibits that the defendants filed in support of their motion. Citations in the form "Ex. [letter] at —" refer to exhibits that the plaintiffs filed with their answering brief. Page citations refer to the internal pagination or, if there is none, then to the last three digits of the control number.

6

## A. Walmart, Its Governance, And The Applicable Regulatory Framework

Walmart is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart operates three primary business segments: Sam's Club, Walmart International, and Walmart U.S.

Walmart has a board of directors (the "Board") charged with overseeing the business and affairs of the corporation. The Board meets at least four times per year. The Board's duties include "overseeing the Company's policies with respect to compliance with applicable laws and regulations and adopting policies of corporate conduct designed to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls." Ex. 4 at 3.

The Board has established an Executive Committee that "[i]mplements policy decisions of the Board" and "[a]cts on the Board's behalf between Board meetings." Ex. 80 at 28. The Executive Committee meets "as often as it determines to be necessary or appropriate." Ex. 70 at 50.

The Board has established an Audit Committee to oversee and monitor "compliance by the Company with legal and regulatory requirements." Ex. 5 at 1. The Audit Committee meets at least quarterly and reports to the Board. The Audit Committee meets "no less than annually" with Walmart's ethics and compliance senior executives. *Id.* at 8.

Through its Health and Wellness Division, Walmart operates one of the largest pharmacy chains in the United States, with more than 5,000 retail pharmacies located in its Walmart and Sam's Club stores. Until 2018, Walmart engaged in the wholesale

7

pharmaceutical distribution business by operating distribution centers that supplied its retail pharmacies.

Walmart engaged in the retail dispensing and wholesale distribution of prescription opioids under licenses from the DEA, which required that Walmart comply with the Controlled Substances Act. *See* 21 U.S.C. § 801 *et seq.*; 21 C.F.R. § 1300 *et seq.* In its public filings, Walmart acknowledges that its business depends on compliance with its legal obligations related to the distribution and dispensing of controlled substances. *See, e.g.*, Ex. 1 at 22.

As a "dispenser,"[2] a pharmacy must establish and maintain "effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a). The regulations for dispensers include specific requirements that pharmacies must meet. A pharmacy must implement security measures to maintain control over its inventory of controlled substances, 21 C.F.R. § 1301.75, and the security measures must enable the pharmacy to identify instances of loss or theft and notify the DEA, *id.* § 1301.76.

---

[2] *See* 21 C.F.R. § 1300.01 ("Dispenser means an individual practitioner, institutional practitioner, *pharmacy* or pharmacist who dispenses a controlled substance." (emphasis added)); *see also* 21 U.S.C. § 802(10) (defining dispenser as "a practitioner who so delivers a controlled substance to an ultimate user"). "[D]ispensers of controlled substances are obligated to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances." *See In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 629 (N.D. Ohio 2020), *clarified on denial of reconsideration*, 2020 WL 5642173 (N.D. Ohio Sept. 22, 2020).

As a "practitioner,"[3] a pharmacy must maintain records about the prescriptions that its pharmacists process. *See* 21 C.F.R. § 1304.22(c). Exercising their professional judgment, pharmacists must refuse to fill prescriptions that are suspicious, report the refusal to the DEA, and maintain records on red-flagged prescriptions. *See In re Nat'l Prescription Opiate Litig.*, 2020 WL 5642173, at *3 (N.D. Ohio Sept. 22, 2020).

While operating as a wholesale distributor of prescription opioids, Walmart was obligated to maintain "effective control against diversion of [opioids] into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1). A distributor must "design and operate a system" to identify "suspicious orders of controlled substances" and report them to the DEA. 21 C.F.R. § 1301.74(b). "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.* Once a distributor has reported a suspicious order, the distributor must either decline to ship the order or conduct due diligence to determine whether the order is likely to be diverted into illegal channels. The distributor can only ship the order if it determines after conducting due diligence that the order is *not* likely to be diverted into illegal channels. *See Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 212 (D.C.

---

[3] *See* 21 U.S.C. § 802(21) ("The term 'practitioner' means a physician, dentist, veterinarian, scientific investigator, *pharmacy*, hospital, or other person licensed, registered, or otherwise permitted . . . to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research." (emphasis added)).

9

Cir. 2017) (discussing distributor obligation under *Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007)).

The Controlled Substances Act does not mandate strict compliance with its requirements. Only substantial compliance is necessary. *In re Nat'l Prescription Opiate Litig.*, 2021 WL 3917174, at *3 (N.D. Ohio Sept. 1, 2021) (citing 21 C.F.R. § 1301.71(b)).

## B.    The DEA Settlement

On November 13, 2009, the DEA issued an order to show cause regarding a Walmart pharmacy in San Diego, California. The order to show cause asserted that the pharmacy:

(1) improperly dispensed controlled substances to individuals based on purported prescriptions issued by physicians who were not licensed to practice medicine in California;

(2) dispensed controlled substances to individuals located in California based on Internet prescriptions issued by physicians for other than a legitimate medical purpose and/or outside the usual course of professional practice in violation of federal and state law; and

(3) dispensed controlled substances to individuals that [the San Diego Walmart pharmacy] knew or should have known were diverting controlled substances.

Ex. A § II. Walmart disputed the factual allegations alleged in the order to show cause and disagreed with the DEA's position. *Id.*

In February 2011, Walmart and the DEA entered into the DEA Settlement, which required that Walmart implement and maintain a compliance program for all of its

pharmacies and imposed a list of specific requirements. *Id.* § III.4.a. The term of the DEA Settlement ran from March 11, 2011 to March 11, 2015. *Id.* at § III.13.

**C.      Walmart's Initial Efforts To Comply With The DEA Settlement**

Walmart took some steps to comply with the DEA Settlement. Most notably, Walmart generated a set of policies and procedures that documented various obligations that its personnel would fulfill. Those policies and procedures described an oversight structure for achieving compliance within the Health and Wellness Division.

Problems arose when it came time to create the infrastructure that would enable Walmart's pharmacists and other personnel to follow the policies and procedures. The team responsible for creating and implementing a monitoring program that would comply with the DEA Settlement estimated that it would require $40 million to complete all of the team's projects. Walmart gave them a budget of $11 million. That budget could fund Walmart's existing compliance projects, but would not cover the cost of any new programs. *See* Compl. ¶¶ 11, 156; Ex. 82.

In January 2012, nine months into the term of the DEA Settlement, Walmart's Chief Administrative Officer reported to the Audit Committee and the Executive Committee that compliance efforts had fallen behind schedule and that "[s]ignificant compliance issues remain unresolved." Ex. 6 at '035. A supporting slide deck explained that a "[n]ew compliance plan is being developed" to achieve compliance within five years. *Id.* at '037. Compliance on that timeline meant January 2017, nearly two years after the DEA Settlement would expire. At this stage of the case, plaintiffs are entitled to the inference

11

that the directors knew Walmart was not on track to comply with the DEA Settlement and would not achieve compliance during its term.

In November 2012, a committee of senior compliance executives held a meeting. The minutes span seven pages. Walmart redacted all of the substantive portions for non-responsiveness and attorney-client privilege, with the exception of the following sentence: "Ms. Harris then provided an update to the Committee on the overall status of Health and Wellness Compliance projects." Ex. 11 at 2. Without any other substantive text to draw on, there are at least two possible inferences. One is that the update described Walmart as making good progress and being on track to achieve compliance with the DEA Settlement. The other is that the update described Walmart as remaining behind and unable to achieve compliance with the DEA Settlement. At the pleading stage, the plaintiffs are entitled to the latter inference.

In March 2013, Walmart's Chief Compliance Officer provided a report to the Audit Committee. The report gave each project a color to indicate its status: green for "on schedule," yellow for "watch list," and red for "major issues." *See* Ex. 46 at '601. The report stated that the "diversion analytics tool to monitor suspicious controlled substance activity remains in a status of red." *Id.* Development of the diversion analytics tool had stopped because of a problem with Walmart's Data Centralization project, which was also in a status of red. Walmart had only purchased a limited amount of database capacity, and nothing could be done until more was purchased. Without more capacity, Walmart could

12

only implement a read-only database, which could not support "several critical business and compliance initiatives." *Id.*

During a two-day meeting of the Board in September 2013, the Audit Committee, two members of the Executive Committee, and Walmart's CEO had a "legal, compliance, and ethics session," where Jay Jorgensen, Senior Vice President and Global Chief Compliance Officer for Walmart, presented a health and wellness compliance update. Ex. 47 at 18. The meeting minutes comprised eighteen pages. Walmart redacted all but the following three lines: "Mr. Williams reported that the [Audit] Committee had conducted a legal, compliance and ethics session. He stated that during this session, the Committee had received [REDACTED] . . . reports regarding Walmart's health and wellness compliance initiatives. . . ." *Id.* Mr. Williams is presumably Christopher J. Williams, then-Chairman of the Audit Committee. Consistent with Walmart's redaction practice, the unredacted portion identifies a topic without providing any indication as to its substance. One inference is that Mr. Williams told his fellow directors that everything was on track. Another inference is that Mr. Williams told the directors that key aspects of Walmart's program were not on track, that those components were in a status of red, and that Walmart was not complying with the DEA Settlement. At this stage of the proceedings, the plaintiffs are entitled to the latter inference.

In October 2013, the Health and Wellness Division provided the Board with an assessment of Walmart's controlled substances risk, which reported that the project to

13

"[d]esign & operate a systems [sic] to detect suspicious orders and report to the DEA when discovered" remained in red. Ex. C. at '751. The summary reported that the project to "[e]stablish additional maximum order limits of highly abused drugs" was in yellow. *Id.* Neither project had a delivery date. For both, the delivery date was marked "TBD." *Id.*

The four-year term of the DEA Settlement was scheduled to end on March 11, 2015. As of October 2013, Walmart had used up two years and seven months of the four-year term. Walmart had only seventeen months left to implement the mandates in the DEA Settlement, including a full-scale suspicious order monitoring system.

## D.    Walmart Prioritizes Inventory Diversion.

In March 2014, Walmart publicly announced that during fiscal year 2014, the company had made certain improvements to its Health and Wellness compliance program that included "[c]reating a diversion analytics tool to deter, detect and remedy attempts at pharmaceutical diversion in U.S. Walmart and Sam's Club pharmacies."[4] Walmart's new system only monitored for theft and loss of controlled substances *within* Walmart. The new system did not address other aspects of Walmart's anti-diversion obligations. Walmart

---

[4] Compl. ¶ 352; Dkt. 40 at 51; *accord* Wal-Mart Stores, Inc., Definitive Additional Materials (Schedule 14A), at 9 (Apr. 23, 2014). Neither party submitted the proxy statement or its definitive additional materials as exhibits. The court may, however, take judicial notice of the statement. *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Applying [Delaware] Rule [of Evidence] 201, Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'" (quoting *Tyson Foods*, 919 A.2d at 584)).

14

notably took a step to meet a compliance obligation that helped its bottom line, while not taking steps that didn't. *See* Compl. ¶ 191.

That same month, the head of compliance for the Health and Wellness Division reported to the Audit Committee on the division's compliance priorities for fiscal year 2015. *See* Ex. B. The presentation included a photograph from a Walmart pharmacy in Tampa, Florida that depicted scores of patrons waiting in line at 7:00 a.m., two hours before the pharmacy opened, with a "very high number of prescriptions for Oxycodone." Compl. ¶ 185. The presentation reported that after the July 2012 incident, the compliance team "began to assess our processes" to avoid the "risk of our pharmacies becoming the pharmacy of choice for 'pill mills.'" *See* Ex. B.

## E.    Additional Reports On Walmart's Compliance Efforts

In May 2014, the Audit Committee received a fourteen-page report that summarized the status of compliance efforts within the Health and Wellness Division. The report discussed Walmart's new diversion analytics tool that monitored for internal inventory diversion. With the tool in place, the compliance team uncovered major instances of internal opioid diversion, including a shortfall of 16,000 dosage units from a pharmacy in Indiana and a shortfall of 4,689 dosage units from two pharmacies in Maryland. After discussing Walmart's obligations under the Controlled Substances Act, the report observed that Walmart had experienced a 114% increase in incidents relative to the prior year. The report noted that during fiscal year 2014, state and federal regulatory agencies made 2,096 visits to Walmart pharmacies, with 547 visits (26%) resulting in violations of record-

keeping requirements, associate licensing requirements, equipment deficiencies, prescription discrepancies, incomplete logs, or instances of internal diversion.

The report did not mention the DEA Settlement, Walmart's obligations under it, or the status of Walmart's efforts to comply with those obligations. Only ten months remained before the term of the DEA Settlement ended.

In June 2014, the Health and Wellness Division evaluated the progress of the suspicious order monitoring project. *See* Ex. D. The assessment recognized that the project was part of the DEA Settlement and that a suspicious order monitoring system still was not in place. The assessment included the following question: "Is the Risk being mitigated today by manual, systemic, or a combination of both today [sic] (regardless of optimal or not)?" *Id.* at '701. The assessment gave a pointed answer: "No." *Id.* The suspicious order monitoring project had "no process in place." *Id.* The report stated "Board Informed," supporting an inference that the Board had been informed of the situation. *Id.*

In November 2014, the Board reviewed Walmart's compliance with the Controlled Substances Act. Walmart withheld the meeting minutes in their entirety. Compl. ¶ 222. One inference is that the Board was told that everything was A-OK. Another inference is that the Board was told that Walmart was failing to comply with the DEA Settlement and could not achieve compliance before it expired.

In February 2015, just one month before the DEA Settlement expired, a pharmacist in Texas wrote to one of Walmart's compliance directors. The pharmacist expressed

concern about filling prescriptions for a pill-mill doctor. *Id.* ¶¶ 124, 260. The compliance

director candidly explained how Walmart had approached the DEA Settlement:

> The [DEA Settlement] that requires the reporting of Refusal to fills expires in 30 days. We have not invested a great amount of effort in doing analysis on the data since the agreement is virtually over. Driving sales and patient awareness is a far better use of our Market Directors and Market manager's time.

*Id.* ¶ 27. That statement openly prioritized profits ("[d]riving sales") over compliance.

## F. The DEA Settlement Expires.

On March 11, 2015, the DEA Settlement expired. There are no non-privileged, unredacted documents from the months leading up to the DEA Settlement that could support an inference that Walmart achieved compliance with its legal obligations under the DEA Settlement. To be clear, Walmart took *some* steps towards compliance. But at the pleading stage, the plaintiffs are entitled to inferences that (i) Walmart did not achieve compliance with its legal obligations under the DEA Settlement, (ii) Walmart's directors and officers knew that Walmart was not complying with its legal obligations, and (iii) Walmart's directors and officers did not take action to cause Walmart to achieve compliance.

In April 2015, just after the DEA Settlement expired, Walmart's proxy statement disclosed that "management reported regularly to the Audit Committee regarding ongoing enhancements to our global compliance program and progress in implementing these objectives. At the end of fiscal 2015, the Audit Committee determined that, in its qualitative

17

judgment, adequate progress had been achieved in implementing these objectives."[5] The

disclosure did not mention the DEA Settlement. Similar disclosures appeared in Walmart's

proxy statements for 2016, 2017, and 2018.[6]

## G. The Pharmacy Issues Continue.

After the DEA Settlement expired, Walmart introduced a software program to

capture information about prescriptions that pharmacists refused to fill. But Walmart

prohibited pharmacists from accessing the information, thus limiting pharmacists' ability

to make informed decisions about whether to refuse to fill prescriptions. As of July 29,

2018, pharmacists still could not access the information. Compl. ¶¶ 253–255.

In November 2016, there was a meeting of compliance function executives. Ex. 13

at '682. The minutes of the meeting are virtually all redacted. The only substantive sentence

---

[5] Wal-Mart Stores, Inc., Definitive Proxy Statement (Schedule 14A), at 53 (Apr. 22, 2015).

[6] *See* Wal-Mart Stores, Inc., Definitive Proxy Statement (Schedule 14A), at 49–50 (Apr. 20, 2016) ("[O]ver the past few years, our company has made significant improvements to our ethics and compliance program around the world. To further emphasize our commitment to ethics and compliance, in early fiscal 2016, our company's senior leadership again developed a timetable for implementing further enhancements to our global ethics and compliance program on a prioritized basis. These objectives covered such subject matters as . . . health and wellness compliance . . . These objectives sought to enhance key elements of a corporate ethics and compliance program, including but not limited to developing and implementing enhanced compliance protocols and procedures, hiring and training of key compliance personnel, monitoring and assessment of various elements of the program, internal communications, and access to information."); Wal-Mart Stores, Inc., Definitive Proxy Statement (Schedule 14A), at 60 (Apr. 20, 2017) (same); Walmart Inc., Definitive Proxy Statement (Schedule 14A), at 51 (Apr. 20, 2018) (same).

states, "Mr. Jorgensen noted that the materials for the Committee's October 13, 2016 meeting included U.S. Health and Wellness Compliance training materials." *Id.* at '683. One possible inference is that Mr. Jorgensen provided a positive update on the training materials. Another possible inference is that Mr. Jorgensen reported on inadequacies in the training materials. At this stage of the proceedings, the plaintiffs receive the benefit of the latter inference.

## H.    Distribution Issues

From the early 2000s until April 2018, Walmart distributed opioids to its pharmacies from its distribution center in Bentonville, Arkansas. Compl. ¶ 131. Before November 2010, Walmart had no written policies or procedures about monitoring for suspicious orders. *Id.* ¶ 133. Instead, Walmart charged its hourly wage employees—who had no medical, pharmaceutical, or public health training—with identifying any orders that looked suspicious. Walmart did not provide any standards, training, or processes to assist them in making that determination. *Id.* ¶ 134.

In November 2010, Walmart implemented the first written policy for its distribution business. Titled "Identifying and Reporting Purchases of Controlled Substances," it contemplated employees at the Bentonville distribution center reviewing a monthly report by hand and identifying any orders for controlled substances that constituted more than 3.99% of a single pharmacy's total drug purchases during the prior month. *Id.* ¶ 139. The policy did not identify any other criteria that could render an order suspicious. The employees were instructed to "forward the reports to the appropriate [Walmart] Drug

19

Diversion Coordinator for further review." *Id.* ¶ 140 (alteration in original). There were no written policies about what the Drug Diversion Coordinator was supposed to do. The Executive Committee and the Audit Committee were briefed on this system. *Id.* ¶ 141.

Walmart later determined that it needed a computerized system. Rather than obtaining a specialized compliance system, Walmart repurposed an existing inventory tool called Reddwerks that had not been designed for compliance. To flag suspicious orders, Walmart implemented "hard limits" on orders of more than 2,000 dosage units of oxycodone and 5,000 dosage units of other opioid medications. *Id.* ¶ 174. The Reddwerks system had no ability to flag suspicious orders based on other criteria. *Id.* ¶ 176.

Walmart's policy called for identifying orders that exceeded those hard limits, labeling them as suspicious, and reporting them to the DEA. Choosing a more profitable approach, Walmart adopted a practice of cutting back suspicious orders and filling them up to the hard-limit thresholds as non-suspicious orders. Walmart then passed along the balance of the orders to another distributor to fill. Walmart thus ensured that all of the orders were filled, even though they exceeded the hard limits. *Id.* ¶¶ 173–177.

The cut-back system resulted in Walmart reporting almost no suspicious orders to the DEA. At this stage of the proceedings, the plaintiffs are entitled to an inference that Walmart knowingly circumvented its own suspicious order monitoring system.

In January 2014, Walmart hired an external consulting outfit, called MuSigma, to evaluate the repurposed Reddwerks system and its hard limits. MuSigma identified serious

flaws and recommended modifications to enable the tool to do more than simply cap prescriptions at hard limits. The modifications would have cost $185,000. Walmart rejected the proposal. *See id.* ¶ 218–220.

Walmart did not contemplate implementing a true suspicious order monitoring system until 2015. At a meeting in February 2015, the Audit Committee reviewed Walmart's compliance objectives for fiscal year 2016. *Id.* ¶ 224. A pre-meeting memorandum from the Global Chief Compliance Offer identified a noteworthy initiative: "In the U.S., implement controlled substance suspicious-order monitoring enhancements (which include both software and personnel changes) in the U.S. distribution facilities." Ex. 51 at '002. The memorandum did not describe the "enhancements," and the books and records produced by Walmart support a reasonable inference that Walmart did not have a meaningful system that could be enhanced. What Walmart contemplated was implementing its first meaningful system.

The Audit Committee signed off on the plan, which called for implementation to begin in August 2015. The full Board met the following day, and the Audit Committee reported that it had approved Walmart's compliance objectives. *See* Compl. ¶¶ 228–233. All of the directors knew that Walmart was not yet complying with its obligations as a distributor under the Controlled Substances Act.

I.    **The Opioid MDL**

During 2016 and 2017, Walmart faced a barrage of legal actions based on its roles as a dispenser and distributor of prescription opioids. In November 2017, Walmart

management decided to stop acting as a distributor of prescription opioids. After winding down the business, Walmart stopped distributing prescription opioids in April 2018. Walmart continued to dispense prescription opioids through its pharmacies.

In December 2017, the federal cases that thousands of plaintiffs had filed across the country were consolidated into the Opioid MDL. The bellwether complaint alleged that Walmart failed to:

- "adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers";

- "put in place effective policies and procedures to prevent their stores from facilitating diversion and selling into a black market";

- "conduct adequate internal or external reviews of their opioid sales to identify patterns regarding prescriptions that should not have been filled";

- "effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions"; and

- "take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances."

Compl. ¶ 289.

## J.     Walmart Tries To Avoid Criminal Prosecution.

In May 2018, the U.S. Attorney for the Eastern District of Texas informed Walmart that it would bring a criminal indictment against Walmart for its role in the opioid epidemic.

Facing the threat of criminal charges, Walmart amended its pharmacy operating manual. The new manual detailed a number of prescriber and patient red flags. After taking this step, Walmart issued a press release titled, "Walmart Introduced Additional Measures

22

to Help Curb Opioid Abuse And Misuse." Ex. H. The press release promised that within the next sixty days, Walmart would restrict initial acute opioid prescriptions to no more than a seven-day supply. Walmart also promised to require e-prescriptions for controlled substances starting in January 2020:

> In an effort to continue to be part of the solution to our nation's opioid epidemic, Walmart is introducing new policies, programs and tools aimed at curbing opioid misuse and abuse. These initiatives apply to all Walmart and Sam's Club pharmacies and pharmacists in the United States and Puerto Rico.
>
> . . .
>
> Further, by the end of August 2018 . . . [i]n states that allow access, the company's pharmacists will have access to and use the controlled substance tracking tool, NarxCare. NarxCare is a tool that helps pharmacists make dispensing decisions and provides pharmacists with the real-time interstate visibility that currently exists.

*Id.*

## K.     The *ProPublica* Article

In March 2020, *ProPublica* published an article detailing Walmart's role in the opioid epidemic. Before the article was published, Walmart stockholders were unaware of the DEA Settlement. The article also revealed that between 2000 and 2018, the DEA sent fifty letters of admonition to Walmart for its dispensing practices, and multiple pharmacists raised concerns about filling prescriptions for pill-mill doctors.

On April 14, 2020, the Board met. There was no discussion of compliance issues in the Health and Wellness Division.

23

On September 14, 2020, Walmart issued a nine-page report summarizing the "important components of Walmart's response to the opioid crisis and the Board's oversight of Walmart's activities related to the dispensing of prescription opioid medications in the United States." *See* Ex. 12 at 1. The report asserted that "[a]s a whole and through its committees, Walmart's Board of Directors oversees Walmart's risk management policies and practices, including related [sic] to prescription opioids." *Id.* According to the report, the Board oversaw Walmart's "risk tolerance" and received "regular reports from Board committee chairpersons and members of senior management regarding risk-related matters." *Id.* The report discussed the Audit Committee's oversight of global compliance and emphasized that the committee consisted "solely of independent directors." *Id.*

As for steps that Walmart actually had taken to address the opioid crisis, the report highlighted the availability of NarxCare. The report then discussed Walmart's deference to its pharmacists' discretion in refusing to fill orders:

> We support our pharmacists when they exercise their professional judgment not to fill a controlled substance. Individual Walmart pharmacists may refuse to fill a particular prescription of concern (known as a "refusal to fill" or "RTF"), based on the presence of certain unresolved "red flags" (warning signs that a prescription might not be for a legitimate medical purpose) or combinations of unresolved red flags. If a pharmacist has more general concerns about a prescriber's controlled-substance prescribing practices, the pharmacist may refuse to fill all controlled-substance prescriptions written by that provider (a "blanket refusal to fill" or "BRTF").

*Id.* at 4.

In December 2020, the U.S. Department of Justice (the "DOJ") filed a civil complaint against Walmart in the U.S. District Court for the District of Delaware. *See* Complaint, *United States v. Walmart Inc.*, No. 1:20-CV-01744-CFC (D. Del. Dec. 22, 2020). The DOJ sought injunctive relief to restrain Walmart's continuing violations of the law and alleged that Walmart repeatedly violated the Controlled Substances Act, both as a dispenser and as a distributor. Compl. ¶¶ 300, 350; Dkt. 40 at 24.

The DOJ alleged that from June 2013 to November 2017, Walmart reported only 2,014 suspicious orders to the DEA, even though it shipped an estimated 37.5 million orders of controlled substances to its pharmacies. By comparison, Walmart's backup distributor, McKesson Corporation, reported more than 13,000 suspicious orders from Walmart's pharmacies during the same period, despite fulfilling far fewer orders. Compl. ¶ 25.

## L. Liability In Opioid MDL

On November 23, 2021, after six weeks of trial, a jury in the Opioid MDL found that two Ohio counties "prove[d] by the greater weight of the evidence" that Walmart "engaged in intentional and/or illegal conduct which was a substantial factor" in the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit

market outside of appropriate medical channels."[7] The jury found that "widespread prevalence of opioid-use disorder . . . and addiction" was "the direct and foreseeable result of the 'oversupply of legal prescription opioids, and diversion of these opioids . . . ,' caused by [Walmart's] wrongful conduct." *Id.* at *13. The jury also found that Walmart engaged in "improper dispensing conduct" as "evidenced by [its] systemic failures to investigate and resolve red-flag prescriptions . . . ." *Id.* at *30. "[S]pecific evidence . . . demonstrated that [Walmart] dispensed massive quantities of red-flagged prescriptions without taking adequate measures to investigate or otherwise ensure the prescriptions were appropriately dispensed." *Id.* From this, "[t]he jury reasonably concluded that [Walmart] dispensed opioids without having in place effective controls and procedures to guard against diversion—controls and procedures they knew were required and knew they had not adequately employed." *Id.* at *32.

During the trial, the jury heard from Susanne Hiland, a Walmart employee from the Health and Wellness Division, who observed that Walmart did not provide enough funding to pursue anti-diversion initiatives. During her testimony, Hiland confirmed that, as late as March 4, 2016, regional directors did not have access to refusal-to-fill reports. Hiland also

---

[7] Abatement Order, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio Aug. 17, 2022), 2022 WL 3443614 at *4, *appeal pending*, *Trumbull Cnty. v. Purdue Pharma, L.P.*, No. 22-3753 (6th Cir.).

confirmed that pharmacists could not determine from Walmart's system whether another Walmart pharmacy had refused to fill a prescription. Compl. ¶ 253–254.

After the jury verdict, the court held a bench trial to determine the appropriate remedy. In August 2022, the court directed Walmart and its fellow pharmacy defendants to pay $650.6 million into an abatement fund.[8] The court entered an injunction order requiring Walmart to adopt substantially compliant reforms to remediate deficient controls and reporting systems under the Controlled Substances Act.[9]

## M. The Books And Records Action

On May 4, 2020, two months after the *Pro Publica* article, two of the three plaintiffs sent Walmart a demand to inspect books and records under Section 220. Walmart rejected the demand in its entirety. *See* Compl. ¶¶ 57–63.

On June 17, 2020, Plaintiff Police and Fire Retirement System of the City of Detroit pursued its enforcement actions.[10] Plaintiff Norfolk County Retirement System pursued its

---

[8] Judgment Order, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio Aug. 22, 2022), 2022 WL 4099669, *appeal pending*, *Trumbull Cnty. v. Purdue Pharma, L.P.*, No. 22-3753 (6th Cir.).

[9] Injunction Order, *In re Natl Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio Aug. 17, 2022), ECF No. 4611-1, *appeal pending*, *Trumbull Cnty. v. Purdue Pharma*, *L.P.*, No. 22-3753 (6th Cir.).

[10] *See* Verified Complaint Pursuant to 8 *Del. C.* 220 to Compel Inspection of Books and Records, *Police & Fire Ret. Sys. of City of Detroit v. Walmart Inc.*, C.A. No. 2020-0478-JTL, Dkt. 1 (Del. Ch. June 17, 2020).

27

enforcement action on the same date. [11] Plaintiff Ontario Provincial Council of Carpenters'

Pension Trust Fund filed its enforcement action on August 21, 2020.[12] The three plaintiffs

agreed to coordinate their Section 220 actions. On October 19, 2020, the court found that

Walmart lacked any reasonable basis to dispute the proper purpose element for production

under Section 220 and that the plaintiffs were entitled to many of Walmart's books and

records that they requested. *See Walmart*, C.A. No. 2020-0478-JTL, Dkt. 37 at 50–51. By

final order dated October 29, 2020, the court required Walmart to produce various

categories of documents. *See Walmart*, C.A. No. 2020-0478-JTL, Dkt. 39.

On January 27, 2021, Walmart purported to complete its production of books and

records and produced a certification of completeness. The plaintiffs asserted that

Walmart's Section 220 production and its privilege log were utterly deficient. After

additional correspondence between the parties, Walmart produced a revised privilege log

on April 9, 2021, and a supplemental production on April 12, 2021.

---

[11] *See* Verified Complaint Pursuant to 8 *Del. C.* 220 to Compel Inspection of Books and Records, *Norfolk Cnty. Ret. Sys. v. Walmart Inc.*, C.A. No. 2020-0482-JTL, Dkt. 1 (Del. Ch. June 17, 2020).

[12] *See* Verified Complaint Pursuant to 8 *Del. C.* 220 to Compel Inspection of Books and Records, *Ontario Provincial Council of Carpenters' Pension Trust Fund v. Walmart Inc.*, C.A. No. 2020-0697-JTL, Dkt. 1 (Del. Ch. Aug. 21, 2020).

**N.    This Litigation**

The plaintiffs filed their initial complaint on September 27, 2021. Dkt. 1. The defendants moved to dismiss, and the plaintiffs filed an amended complaint as contemplated by Court of Chancery Rule 15(aaa). The plaintiffs filed the currently operative complaint on February 22, 2022. It names as defendants eight members of the Board and two Walmart officers who were not on the Board. Three members of the Board also served as Walmart officers.

In Count I, the complaint asserts that the directors breached their fiduciary duties by consciously failing to ensure that Walmart complied with the Controlled Substances Act and the DEA Settlement. Compl. ¶ 363. The complaint alleges that the directors also failed to make a good faith effort "to implement and monitor internal reporting policies and systems." *Id.* ¶ 364.

In Count II, the complaint asserts that the officers breached their fiduciary duties in the same manner as the directors. An additional, officer-specific theory asserts that the officers breached their fiduciary duties "by failing to inform the Board about Walmart's regulatory compliance failures in dispensing and self-distributing opioids." *Id.* ¶ 375.

On June 24, 2022, the defendants moved to dismiss the amended complaint in its entirety. The defendants argued that the claims were time-barred, that the plaintiffs had not established demand futility under Rule 23.1, and that the claims against two of the defendants should be dismissed under Rule 12(b)(6). Alternatively, Walmart requested a

stay of litigation pending resolution of the DOJ's Delaware action. On September 28, 2022, the court heard oral argument on this motion.

**O.    The Nationwide Settlement**

On November 15, 2022, Walmart announced that it had agreed to "a $3.1 billion nationwide opioid settlement framework designed to resolve substantially all opioid lawsuits and potential lawsuits by state, local, and tribal governments, if all conditions are satisfied." Press Release, Walmart, Inc., Walmart Announces Nationwide Opioid Settlement Framework (Nov. 15, 2022). The settlement did not resolve all of the opioid cases involving Walmart. Most notably, the DOJ's Delaware action remains pending.

In the settlement, Walmart agreed to implement expansive procedures and controls, including procedures to avoid diversion of controlled substances. It is reasonable to infer that before the settlement, although Walmart had taken some steps over the years to improve its oversight policies, its policies remained inadequate.

By letter dated as of November 21, 2022, the court asked the parties to address whether the settlement had implications for the court's consideration of the pending motions. The parties submitted supplemental briefs on that topic on January 13, 2023.

This decision addresses laches and whether the plaintiffs are entitled to equitable tolling of the statute of limitations. It does not address the defendants' other bases for dismissal, nor does it address the stay.

## II.     LEGAL ANALYSIS

In their lead argument for dismissal, the defendants assert that the plaintiffs' claims are untimely. When asserting a timeliness defense, a defendant contends that even if a claim were viable, the plaintiff cannot assert it. To analyze the timeliness issue, the court assumes the validity of the claim, then applies timeliness principles. *Collis*, 287 A.3d at 1193. For a court to grant a motion to dismiss on timeliness grounds under Rule 12(b)(6), the complaint's allegations must show that the claim was filed too late. *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993) (Allen, C.). A court "must draw the same plaintiff-friendly inferences required in a 12(b)(6) analysis" when evaluating whether the factual allegations in a complaint support a timeliness defense. *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 524–25 (Del. Ch. 2005) (internal citation omitted).[13]

---

[13] The *Pettinaro* decision asserts that "[t]his plaintiff-friendly stance does not govern assertion of tolling exceptions to the operation of a statute of limitations (or the running of the analogous period for purposes of a laches analysis), however. A plaintiff asserting a tolling exception must plead facts supporting the applicability of that exception." *Id.* at 525 (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999) (TABLE) ("[T]he party asserting that tolling applies . . . bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.")). As the quotation from the *Dean Witter* decision shows, that case supports the proposition that a plaintiff has the burden to allege facts at the pleading stage that support the application of a tolling doctrine. Other pre-*Pettinaro* authorities said the same thing. *E.g.*, *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *14 (Del. Ch. Nov. 21, 1995) (Allen, C.); *In re USACAFES, L.P. Litig.*, 1993 WL 18769, at *3 (Del. Ch. Jan. 21, 1993). Those authorities do not say that once a plaintiff has pled facts that could support the application of a tolling doctrine, the plaintiff does not receive the benefit of pleading-stage inferences that would support the tolling doctrine's application. The *Pettinaro* decision introduces that concept, without explaining why Rule 12(b)(6) would not govern the inferences to be drawn from pled facts. Subsequent decisions have

31

When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pled factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

The plaintiffs have asserted an Information-Systems Claim, a Red-Flags Claim, and a *Massey* Claim.[14] Each is an equitable claim for breach of fiduciary duty, so laches

---

repeated *Pettinaro*'s statement about Rule 12(b)(6)'s inapplicability, without investigation. *See, e.g.*, *Bocock v. INNOVATE Corp.*, 2022 WL 15800273, at *12 (Del. Ch. Oct. 28, 2022); *Matter of Est. of du Pont Dean*, 2017 WL 3189552, at *4 (Del. Ch. July 13, 2017); *Eni Hldgs., LLC v. KBR Gp. Hldgs., LLC*, 2013 WL 6186326, at *11 (Del. Ch. Nov. 27, 2013).

Under Rule 8, a plaintiff must plead facts supporting an inference that tolling applies. If the plaintiff invokes fraudulent concealment, then the plaintiff must plead particularized facts in compliance with Rule 9. Regardless of the pleading burden, once the plaintiff meets it by adequately pleading the pertinent facts, then the plaintiff is entitled to all reasonable inferences to be drawn from those facts. I understand why a plaintiff must plead facts supporting a tolling doctrine. It is not clear why a plaintiff would not be entitled to inferences drawn from those pled facts, simply because the issue relates to a tolling doctrine. *See, e.g.*, *In re Am. Int'l Gp., Inc. Consol. Deriv. Litig.* (*AIG*), 965 A.2d 763, 805–06 (Del. Ch. 2009) ("But, even though fraud must be stated with particularity, this is still a motion to dismiss, and the Stockholder Plaintiffs are entitled to have me draw all reasonable inferences in their favor." (internal citation omitted)), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (TABLE).

[14] *See In re McDonald's Corp. S'holders Deriv. Litig.*, 289 A.3d 348, 359–63 (Del. Ch. 2023) (explaining origins and nature of an Information-Systems Claim and a Red-Flags Claim); *City of Detroit Police & Fire Ret. Sys. v. Hamrock*, 2022 WL 2387653, at *17

32

provides the proper framework for analyzing timeliness. *See Collis*, 287 A.3d at 1194.

Because the plaintiffs only seek money damages, which is relief available at law, the most

closely analogous statute of limitations establishes a presumptive period within which the

claim must be filed after it accrues. *Id.* at 1195. For a claim for breach of fiduciary duty,

the analogous statute of limitations is three years. *Id.*

To apply a limitations period, a court must determine when the claim accrued. *Id.*

The *Collis* decision considered three different approaches to claim accrual: the discrete act

approach, the separate accrual approach, and the continuing wrong approach. *Id.* at 1195–

1201. The court held that for a Red-Flags Claim, the proper framework is the separate

accrual approach, under which each day that the defendants' ongoing course of conduct

continues constitutes a separate violation for purposes of claim accrual. *Id.* at 1202–05.

The *Collis* decision held that, at a minimum, the separate accrual approach applies to a

*Massey* Claim, while holding out the possibility that the continuing wrong approach could

apply. *Id.* at 1205–08. The *Collis* case did not involve an Information-Systems Claim.

A.    **Selecting An Accrual Method For An Information-Systems Claim**

Because this case involves an Information-Systems Claim, the court must determine

what accrual method to use for that species of claim.

---

(Del. Ch. June 30, 2022) (explaining origins and nature of a Red-Flags Claim and a *Massey* Claim).

33

### 1. Choosing An Accrual Method Based On The Characteristics Of An Information-Systems Claim

The discrete act approach "makes the most sense when (i) the gravamen of the action involves a finite quantum of conduct that causes all of the harm which may result, such that the continuation or repetition of the act will not increase the plaintiff's damages, and (ii) the initial impact of the act provides the potential plaintiff with both knowledge of the conduct and an incentive to sue." *See Collis*, 287 A.3d at 1202 (citing *Developments in the Law Statutes of Limitations*, 63 Harv. L. Rev. 1177, 1205 (1950)). For a claim with those features, the discrete act approach gives the plaintiff an incentive to promptly file a single suit that can address all of the harm resulting from the discrete act. The continuing wrong approach and the separate accrual approach make more sense when it is difficult to identify a clear starting point for a claim and the conduct persists over time. *Id.*

The gravamen of an Information-Systems Claim is that corporate fiduciaries "utterly failed to implement any reporting or information system or controls" to address a central compliance risk. *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). "[W]hen directors fail to make any effort to establish an information system to address central compliance risks, then that failure supports an inference of bad faith." *In re McDonald's Corp. S'holder Deriv. Litig.* (*McDonald's Directors*), — A.3d —, 2023 WL 2293575, at *17 (Del. Ch. Mar. 1, 2023). Essential and mission critical risks necessarily qualify as central compliance risks. *Id.* at *16.

34

To plead an Information-Systems Claim, a plaintiff must allege (i) facts supporting an inference that the risk in question was a central compliance risk and (ii) facts supporting an inference that the directors or officers did not make a good faith effort to establish an information system to address it. Sometimes the inherent nature of the issue will support a reasonable inference that it qualifies as a central compliance risk, such as food safety for an ice cream company or airplane safety for an airplane manufacturer. Other times, whether an issue qualifies as a central compliance risk will be less clear.

One reason for ambiguity is that risks evolve over time. In 1996, when Chancellor Allen authored *Caremark*, the idea that cybersecurity might be a central compliance risk would not have registered. Even today, the relative importance of cybersecurity risk has not yet led to a *Caremark* claim surviving a motion to dismiss, although someday it might.[15]

Another reason is that "[t]ime and attention are precious commodities, and with limited supplies of each, officers and directors must make judgments about what risks to monitor." *McDonald's Directors*, 2023 WL 2293575, at *17. The business judgment rule

---

[15] *See Firemen's Ret. Sys. of St. Louis v. Sorenson*, 2021 WL 4593777, at *12 (Del. Ch. Oct. 5, 2021) (noting that cybersecurity threats could become a central compliance risk "as the legal and regulatory frameworks governing cybersecurity advance and the risks become manifest," but dismissing Information-Systems Claim as pled); *see also Constr. Indus. Laborers Pension Fund v. Bingle*, 2022 WL 4102492, at *9 (Del. Ch. Sept. 6, 2022) (rejecting Information-Systems Claim based on cybersecurity risks where the claim was pled as involving business risk rather than legal risk).

protects the decisions that officers and directors make about how and where to devote their time and resources. *Id.*

Outside of what intuitively registers as a central compliance risk, a plaintiff will have difficulty rebutting the business judgment rule when officers or directors have used a rational process to identify risks and made a good faith decision about the level of monitoring resources to deploy. *Id.* By contrast, it may be difficult for a court *not* to draw a pleading-stage inference that an issue could qualify as a central compliance risk if a company:

- Has an enterprise risk management system and has identified a risk as central (such as an enterprise risk report identifying "Respectful Workplace" as a "Top Tier 2" risk that is "Critical to [the company's] mission and values," *id.* at *18); or

- Has a mission statement or set of policies that call out an issue as a priority for the company (such as Standards of Business Conduct and a Human Rights Policy that call for cultivating "respectful workplaces" and creating a professional environment that "builds trust, protects the integrity of our brand, and fuels our success," *id.* at *3); or

- Has touted the importance of and its proficiency in a particular area (such as a company that describes itself as providing "America's best first job," *id.*).

When a company makes statements like the examples above, it becomes reasonably conceivable that protecting employees is a central compliance risk. *Id.* at *17–18.

A party pleading an Information-Systems Claim must also allege facts supporting an inference that corporate fiduciaries failed to make a good faith effort to try to create a suitable monitoring system. Rarely will there be a single and definitive point at which directors or officers consciously fail to address a central compliance risk. Grounds for

36

concern about a particular issue typically add up over time. At some point, a signal emerges from the noise and alerts fiduciaries to the risk. As the situation continues, the ongoing failure to address the risk supports an inference that the fiduciaries failed to make a good faith effort to try.

Identifying the point when the bells start going off is not an easy task, and different individuals may hear them at different times. At some point, however, the fiduciaries have notice of the need to act. From then on, the fiduciaries are making an ongoing series of explicit or implicit decisions to continue not acting. Fiduciaries who have committed a knowing failure to act on day one continue to engage in the same knowing failure on day two and on each day thereafter until they make a good faith attempt to create a monitoring system.

These attributes make the discrete act approach ill-suited for an Information-Systems Claim. Using the discrete act approach treats an Information-Systems Claim as if it were easy to identify a singular act of failing to make a good faith effort to implement a monitoring system. The approach ignores the developing and ongoing nature of the claim.

A discrete act approach also fares poorly when evaluated from the perspective of equity. Compared to other accrual methods, a discrete act approach is more likely to deliver the benefits of repose to defendants, because it is more likely to result in claims being time-barred. But the discrete act approach achieves these benefits at the cost of providing a fair opportunity for plaintiffs to identify and present their claims. *Collis*, 287 A.3d at 1203.

37

One typical justification for a discrete act approach is to encourage the prompt assertion of claims. In stockholder derivative litigation, entrepreneurial plaintiffs' counsel already have powerful incentives to sue quickly because of the competitive dynamics involved in gaining control of a case. *See La. Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 336–38 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013). A discrete act regime would increase that pressure and generate cases about conceptual harms that might never ripen into meaningful disputes. Decisions addressing premature complaints are likely to result in dismissals, which under current law have preclusive effect on the ability of any other stockholder to pursue the same or similar claims. *See Cal. State Tchrs.' Ret. Sys. v. Alvarez*, 179 A.3d 824, 843–44 (Del. 2018); *Pyott v. La. Mun. Police Employs.' Ret. Sys.*, 74 A.3d 612, 617 (Del. 2013). The resulting system would weaken Delaware's ability to rely on private plaintiffs to enforce fiduciary duties. Meanwhile, because the premature lawsuits are unlikely to reach the merits, the potential benefits from resolving cases while evidence is fresh would never arise. *Collis*, 287 A.3d at 1204.

When the wrongdoing is ongoing, the discrete act approach cuts off the accountability mechanism and gives the wrongdoers a free pass once the limitations period runs. After it is too late to sue, the behavior can continue with impunity. The discrete act approach thus can facilitate ongoing wrongdoing, suggesting that the approach should not apply to an Information-Systems Claim.

The next possibility is to apply the continuing wrong approach and treat an Information-Systems Claim as viable until the fiduciary takes action to address the compliance risk. Conceptually, that approach is a better fit, but it goes too far in the other direction. It affords full significance to the ongoing nature of the decision not to implement an information system, while eliminating any opportunity for repose. It thus opens the door to the potential assertion of stale claims, with an increased risk of erroneous results.

The separate accrual approach takes the middle path. It recognizes that an Information-Systems Claim has two dimensions. The wrong begins at some point, then persists until the fiduciaries make an effort to implement a monitoring system or the issue no longer qualifies a central compliance risk. The separate accrual approach accommodates the difficulty in identifying when the claim arose and does not add another reason for a plaintiff to sue quickly. Unlike with the discrete act approach, a single point of accrual does not threaten to make wrongdoing nonactionable, and unlike the continuing wrong approach, the claim cannot extend back across time to the earliest possible point. Using a separate accrual approach for an Information-Systems Claim strikes an appropriate balance by respecting defendants' interests in finality and repose, while preserving a litigation vehicle that can provide accountability and compensation.

### 2. Choosing An Accrual Method Based On The Similarities Between The Three Types Of Claims

Using the separate accrual approach for an Information-Systems Claim also makes sense because of the similarities between an Information-Systems Claim, a Red-Flags

39

Claim, and a *Massey* Claim. The three types are all variants of the same foundational concept: a breach of the duty of loyalty grounded on bad faith action.

When stockholder plaintiffs contend that corporate fiduciaries have breached their duties, they often challenge an affirmative decision that the fiduciaries have made. A board has approved a merger, or granted a compensation package to a CEO, or adopted an advance-notice bylaw. To evaluate whether the fiduciaries have breached their duties, the court applies one of three standards of review: the business judgment rule, enhanced scrutiny, or the entire fairness test. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). Sometimes, evaluating the challenged decision may require considering events that happened during a period before or after the decision, such as when reviewing a sale process under enhanced scrutiny or examining a squeeze-out merger under the entire fairness test. But there remains a focal point—a decision itself—to which the standard of review applies.

In his landmark decision in *Caremark*, Chancellor Allen focused the corporate world's attention on a different scenario: "a board of directors' obligation to supervise or monitor corporate performance." *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 961 (Del. 1996). In this setting, there typically will not be an obvious decision to anchor the standard of review. Instead, there will be a period of time (perhaps prolonged) marked by a combination of inaction and occasional action, followed by a corporate trauma in which the corporation suffers substantial harm. The question becomes whether grounds exist to

shift the loss that the corporation suffered to the fiduciaries who allegedly caused or permitted the harm to occur.

Many of us are fortunate not to encounter individuals in our day-to-day lives who intentionally seek to cause harm. Consistent with that experience, the most intuitive explanation for a corporate trauma is that it happened due to inadvertence by fiduciaries who otherwise would have prevented it. The logical foundation for oversight liability is therefore the duty of care, with liability premised on a showing of gross negligence.

After *Caremark*, considerable debate existed about whether oversight liability derived from the duty of care, the duty of loyalty, or both. In *Graham v. Allis-Chalmers Manufacturing Co.*, the predecessor to *Caremark*, the Delaware Supreme Court contemplated potential liability for both, stating as follows:

> In the last analysis, the question of whether a corporate director has become liable for losses to the corporation through neglect of duty is determined by the circumstances. If he has recklessly reposed confidence in an obviously untrustworthy employee, has refused or neglected cavalierly to perform his duty as a director, or has ignored either willfully or through inattention obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him. This is not the case at bar, however, for as soon as it became evident that there were grounds for suspicion, the Board acted promptly to end it and prevent its recurrence.

188 A.2d 125, 130 (Del. 1963).

41

In *Caremark*, Chancellor Allen used different formulations to frame or refer to the duty of oversight.[16] Most his formulations drew on the duty of care.[17] One passage, however, described the duty as follows:

> Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, as in *Graham* or in this case, in my opinion only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability. Such a test of liability—lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight—is quite high. But, a demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while

---

[16] *See, e.g.*, Stephen M. Bainbridge et al., *The Convergence of Good Faith and Oversight*, 55 UCLA L. Rev. 559, 596–97 (2008) (describing different passages); Robert T. Miller, *Wrongful Omissions by Corporate Directors: Stone v. Ritter and Adapting the Process Model of the Delaware Business Judgment Rule*, 10 U. Pa. J. Bus. & Emp. L. 911, 937–40 (2008) (discussing different formulations).

[17] *Caremark*, 698 A.2d at 960 ("The suit involves claims that the members of Caremark's board of directors . . . breached their fiduciary duty of care to Caremark . . . ."); *id.* at 964 ("The original complaint, dated August 5, 1994, alleged, in relevant part, that Caremark's directors breached their duty of care . . . ."); *id.* at 967 ("The complaint charges the director defendants with breach of their duty of attention or care in connection with the on-going operation of the corporation's business."); *id.* (referencing the "good policy reasons why it is so difficult to charge directors with responsibility for corporate losses for an alleged breach of care"); *id.* at 967 (discussing how to evaluate "compliance with a director's duty of care"); *id.* at 968 (explaining that "the core element of any corporate law duty of care inquiry" is "whether there was good faith effort to be informed and exercise judgment"); *id.* at 970 (analyzing the "claims asserted with this concept of the directors' duty of care … in mind"); *id.* at 971 (discussing what the plaintiffs would have to establish "[i]in order to show that the Caremark directors breached their duty of care").

continuing to act as a stimulus to good faith performance of duty by such directors.

*Id.* at 971. Those references suggested that liability required disloyal conduct that took the form of a lack of good faith.[18]

Writing as a member of this court, Chief Justice Strine took up the question and held that liability for a breach of the duty of oversight always requires a showing of bad faith. *See Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003). Conceived in that way, the oversight duty only derives from the duty of loyalty, with no room for the duty of care. In *Stone v. Ritter*, the Delaware Supreme Court adopted the *Guttman* formulation and held that a breach of the duty of loyalty, such as action in bad faith, is a "necessary condition to liability." 911 A.2d 362, 369–70 (Del. 2006); *see* Bainbridge et al., *supra*, at 595.

After *Stone,* then-Vice Chancellor Strine acknowledged that although the duty of oversight might carry overtones of care, director liability requires more: "[T]o hold directors liable for a failure in monitoring, the directors have to have acted with a state of mind consistent with a conscious decision to breach their duty of care." *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007). After becoming the Chief Justice, he authored

_____

[18] One possible explanation for the different lineaments in the decision is that the corporation in *Caremark* had an exculpatory provision in its charter that eliminated director liability for breaches of the duty of care. *See* 698 A.2d at 971 & n.28. Theoretically, therefore, the *Caremark* framework could have treated the oversight duty as implicating both loyalty and care, but with the exculpatory provision ruling out the possibility of liability for a breach of the latter duty.

43

a Delaware Supreme Court decision that made a similar statement: "If *Caremark* means anything, it is that a corporate board must make a good faith effort to exercise its duty of care. A failure to make that effort constitutes a breach of the duty of loyalty." *Marchand v. Barnhill*, 212 A.3d 805, 824 (Del. 2019). Liability for the duty of oversight is not subject to exculpation because the duty of care has been conceptually excluded. After the reformulation, exculpatory provisions are irrelevant to an oversight claim.[19]

An Information-Systems Claim, a Red-Flags Claim, and a *Massey* Claim each operate within this framework. The Information-Systems Claim and the Red-Flags Claim rest on the premise that a conscious decision not to act is itself a decision that can be the

---

[19] That fact notwithstanding, Delaware decisions continue to refer to the presence of an exculpatory provision as a factor when analyzing an oversight claim, consistent with the intuitive reaction that oversight liability is more closely associated with care. *See, e.g.*, *Firemen's Ret. Sys. of St. Louis v. Sorenson*, 2021 WL 4593777, at *8 (Del. Ch. Oct. 5, 2021) ("Because Marriott's certificate of incorporation contains a provision exculpating its directors for breaches of the duty of care, as permitted under 8 *Del. C.* § 102(b)(7), the plaintiff must plead with particularity facts that support a meritorious claim for breach of the duty of loyalty." (cleaned up)); *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011) ("The likelihood of directors' liability [for a *Caremark* claim] is significantly lessened where, as here, the corporate charter exculpates the directors from liability to the extent authorized by 8 *Del. C.* § 102(b)(7)."); *In re Citigroup Inc., S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. 2009) ("[T]he protection of an exculpatory § 102(b)(7) provision, and the difficulty of proving a *Caremark* claim together function to place an extremely high burden on a plaintiff to state a claim for personal director liability for a failure to see the extent of a company's business risk.").

product of bad faith.[20] The *Massey* Theory looks for or implies an affirmative decision to violate the law, which is itself a decision to act in bad faith.

For each theory, the court looks at a series of fiduciary inactions and actions, made over time, to determine whether they support an inference that the corporate fiduciaries were operating in bad faith. In each case, the evidentiary pattern may suggest a point when the court can infer conscious wrongdoing. If so, then from that point on, the conscious wrongdoing continues until the corporate fiduciaries cause the wrongdoing to cease.

A strong pattern of conduct can support an inference that the corporate fiduciaries intentionally decided to cause the corporation to violate the law, typically because of the

---

[20] *See Aronson*, 473 A.2d at 813 ("[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule"); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) ("The Complaint alleges that the Board had the ability to defer interest payments on the Junior Notes, that the Junior Notes would not receive anything in an orderly liquidation, that [Defendant] owned all of the Junior Notes, and that the Board decided not to defer paying interest on the Junior Notes to benefit [Defendant]. A conscious decision not to take action is just as much of a decision as a decision to act."); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) ("The Special Committee decided not to take any action with respect to the Audit Committee's termination of two successive outside auditors and the allegations made by Ernst & Young. The conscious decision not to take action was itself a decision."); *Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011) ("Wesco stockholders had a choice: they could make an election and select a form of consideration, or they could choose not to make an election and accept the default cash consideration."); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form."); Jean-Paul Sartre, *Existentialism Is a Humanism* 44 (Carol Macomber trans., Yale Univ. Press 2007) ("[W]hat is impossible is not to choose. I can always choose, but I must also realize that, if I decide not to choose, that still constitutes a choice.").

45

cost of compliance and its effect on profits. It is highly unlikely that any formal record of such a decision would exist, nor will there be an after-the-fact confession. What will exist are external manifestations from which, using the theory of mind, an external observer like a judge or a jury can infer conscious intent.[21] The inference that corporate fiduciaries made a decision to violate the law is the foundation for a *Massey* Claim.

A less strong pattern of conduct can support an inference that the corporate fiduciaries were put on notice that the corporation was violating the law or otherwise headed for a corporate trauma, but did nothing in response. Here too, any formal record of a decision is not likely to exist, nor will there be admissions to that effect. Yet an external observer may be able to draw an inference that the corporate fiduciaries willfully turned a blind eye to the evidence and hence consciously decided to do nothing. That inference is the foundation for a Red-Flags Claim.

In its weakest actionable version, the pattern of conduct can support an inference that corporate fiduciaries became aware of a risk that the corporation was violating the law or otherwise heading toward a corporate trauma, yet did nothing. Once again, there is unlikely to be any formal record of a decision not to create a system to monitor the risk, nor any confessions or admissions. Yet an observer may be able to infer that the fiduciaries

---

[21] *See generally* Diamantis, Mihailis, *How To Read a Corporation's Mind* (October 2022). U Iowa Legal Studies Research Paper No. 2022-32, Forthcoming, *The Culpable Corporate Mind* (Elise Bant ed., 2022), available at SSRN: https://ssrn.com/abstract=4155933 or http://dx.doi.org/10.2139/ssrn.4155933

consciously decided not to set up a monitoring system that would generate information pertinent to that risk in the ordinary course of business. That inference is the foundation for an Information-Systems Claim.

A *Massey* Claim, a Red-Flags Claim, or an Information-Systems Claim thus each depend on the court being able to draw an inference of a conscious decision. In a *Massey* Claim, it will be a conscious decision to act. In a Red-Flags Claim or an Information-Systems Claim, it will be a conscious decision not to act. Once that conscious decision is made, the situation continues until the fiduciaries fix it. The fiduciaries could take remedial action at any time, and so the failure to take remedial action is ongoing.

Because of the similarities among the three claims, the same principles for determining claim accrual logically apply to all three claims. In *Collis*, the court held that the separate accrual approach should apply to a Red-Flags Claim. 287 A.3d at 1205. The court also reasoned that at a minimum, the separate accrual approach should apply to a *Massey* Claim, with the possibility that because of the seriousness of a conscious decision to violate the law, the continuing wrong doctrine could apply. *Id.* at 1207.

The Information-Systems Claim is a close relative of the Red-Flags Claim and the *Massey* Claim, so the separate accrual approach should apply. As between the two, the Information-Systems Claim is more closely related to a Red-Flags Claim, because in both cases the court infers a conscious decision not to act, rather than the conscious decision to act. While it may be possible that the continuing wrong approach could govern a *Massey*

47

Claim because of the greater opprobrium associated with a conscious decision to violate the law, the same is not true for an Information-Systems Claim. As with a Red-Flags Claim, the separate accrual approach should apply to an Information-Systems Claim.

Both as a matter of independent analysis and for consistency with the Red-Flags Claim and the *Massey* Claim, this decision concludes that the separate accrual approach is the proper method for determining when an Information-Systems Claim has accrued. As in *Collis*, it is unnecessary in this case to choose between the separate accrual approach and the continuing wrong approach for the *Massey* Claim. As a result, this decision uses the separate accrual method for all of the claims in the case.

## B.     Determining The Lookback Date

To apply the separate accrual method, the court must determine a lookback date to use when measuring the actionable period. The presumptive lookback date is when the plaintiff filed suit. This case was filed on September 27, 2021.

In a derivative action where the plaintiff sought books and records before filing suit, the court can calculate the actionable period using an earlier date tied to the plaintiff's exercise of its informational rights. *See Collis*, 287 A.3d at 1208–11 (collecting authorities). One option is to use the date when the plaintiff filed a Section 220 enforcement action, but "a rule that turned on the filing of a Section 220 enforcement action would incentivize the filing of more enforcement actions (which the court does not need), simply to secure a tolling benefit." *Id.* at 1211. Such a rule also would undermine this court's efforts to promote extra-judicial resolution of books-and-records disputes. *Id.* Such a rule

48

also fails to address situations where, as here, the plaintiffs made a demand on one date, then each pursued separate enforcement actions.

> A stockholder therefore should receive credit for serving a demand and obtaining books and records without the need for an enforcement action. But that does not mean that simply sending a demand will yield a benefit in every case. The stockholder plaintiff must pursue the demand diligently to gain a benefit. That does not mean pressuring the defendant corporation relentlessly, and it does not mean always filing an enforcement action, but it also should not involve months-long periods of stockholder-side inactivity. The process should move forward with deliberate speed.

*Id.* (citation omitted).

In this case, two of the three plaintiffs sent a demand on May 4, 2020, which Walmart rejected in its entirety. A third plaintiff sent a demand on July 2, 2020. After efforts to negotiate were unsuccessful, two of the three plaintiffs filed enforcement actions on June 17, 2020. The third filed its enforcement action on August 21, 2020. By final order dated October 29, 2020, the court required Walmart to produce various categories of documents. *See Police & Fire Ret. Sys. of City of Detroit v. Walmart Inc.*, 2020 WL 6379117, at *1 (Del. Ch. Oct. 29, 2020) (ORDER).

Walmart completed its production on January 27, 2021. The plaintiffs contended that the production was incomplete and challenged Walmart's privilege log. After further negotiations, Walmart produced a revised privilege log on April 9, 2021, and a supplemental production on April 12, 2021.

After reviewing and evaluating the information they obtained, the plaintiffs decided to file suit. They filed their initial complaint on September 27, 2021, five months later. The

49

complaint was thorough and evidenced considerable effort. It spanned 132 pages and contained 316 numbered paragraphs. It was not a pastiche of prolix invective, but rather a detailed effort to assert viable derivative claims.

The pace at which the plaintiffs proceeded is consistent with a steady and diligent effort to use Section 220. A rush to file a lawsuit is neither desirable nor expected. The court therefore will use the date of the Section 220 demands as the lookback date.

Because the plaintiffs sent their demands on two separate dates, there are two possible lookback dates: May 4, 2020 and July 2, 2020. Using the later date could create a disincentive for plaintiffs to work together and coordinate their actions. In a situation where there is a substantial gap between the demands, the earlier stockholder may not want to coordinate with the later filer because of the risk that the earlier filer would lose the tolling benefit. Using the later date has the benefit of avoiding that problem and encouraging coordination, which reduces the burden on responding corporations and the courts. But using the earlier date also creates a risk of a rush to serve Section 220 demands.

As with the question of whether to use an earlier lookback date than the filing of the complaint, which earlier date to use will depend on the facts and circumstances. A bright-line rule is likely undesirable. In this case, the demands were sent in rapid succession, and the choice between the dates has no effect on the timeliness analysis, so this decision uses a lookback date of May 4, 2020 for convenience.

## C. Measuring The Actionable Period

The next step in the separate accrual approach is to use the statute of limitations for a closely analogous legal claim to measure the actionable period by working backward from the lookback date. For a claim for breach of fiduciary duty, the analogous statute of limitations is three years. 10 *Del. C.* § 8106. Measuring back from the lookback date of May 4, 2020, means that the actionable period for this case started on May 4, 2017.

## D. Determining Whether Any Of The Ongoing Conduct Took Place During The Actionable Period

The third step under the separate accrual approach is to determine whether any of the ongoing conduct that gives rise to the plaintiffs' claim took place during the actionable period. If yes, then the claim is timely. If no, then the court must consider any tolling doctrines that the plaintiffs have raised.

### 1. The Pharmacy Issues

The first category of claims involves the Pharmacy Issues. The actionable period stretches back to May 4, 2017. Walmart acted as an operator of retail pharmacies throughout the actionable period and continued to do so after suit was filed. In August 2022, a federal judge entered an injunction order requiring Walmart to remediate deficient controls and reporting systems. In November 2022, Walmart agreed to a settlement that involved a payment of $3.1 billion, plus the implementation of extensive procedures and controls. It is therefore reasonable to infer that the Pharmacy Issues extended throughout the actionable period. The plaintiffs' claims based on the Pharmacy Issues are timely.

51

## 2. The Distributor Issues

The second category of claims involves the Distributor Issues. Once again, the actionable period stretches back to May 4, 2017. Walmart management made the decision to stop acting as an opioid distributor in November 2017 and completed its exit from the business in April 2018. That level of overlap is sufficient to make the plaintiffs' claims based on the Distributor Issues timely.

Because of the limited amount of conduct included in the actionable period, it bears emphasizing that conduct before the actionable period is not actionable. *See Collis*, 287 A.3d at 1180. Evidence from earlier periods may be relevant and discoverable, but conduct that took place before the actionable period cannot support liability. A plaintiff can invoke tolling doctrines to extend the actionable period and bring more conduct within its scope, but that issue need not be addressed at the pleading stage. For purposes of the defendants' timeliness defense, some overlap between the ongoing conduct and the actionable period is sufficient.

## 3. The DEA Settlement Issues

The third category of claims involves the DEA Settlement Issues. The DEA Settlement was in effect from March 11, 2011 to March 11, 2015. The actionable period only extends back to May 4, 2017. The plaintiffs' claims are therefore presumptively untimely. The plaintiffs, however, have invoked three tolling doctrines: equitable tolling, inherently unknowable injury, and fraudulent concealment. This decision need only consider equitable tolling. Considering that doctrine also implicates the question of inquiry

52

notice, because "[i]f the ongoing conduct has stopped and a plaintiff has invoked a tolling doctrine to save an otherwise untimely lawsuit, inquiry notice operates the same way as in a discrete act system and may prevent the plaintiff from relying on a tolling doctrine to make the claim timely." *Collis*, 287 A.3d at 1213.

### a. Equitable Tolling

"[T]he doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary." *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 585 (Del. Ch. 2007)). "The obvious purpose of the equitable tolling doctrine is to ensure that fiduciaries cannot use their own success at concealing their misconduct as a method of immunizing themselves from accountability for their wrongdoing." *AIG*, 965 A.2d at 813.

The defendants argue that equitable tolling only applies to self-dealing claims and is therefore unavailable. As this court discussed in *Collis*, limiting equitable tolling to one subspecies of loyalty violation—self-dealing—does not accurately reflect Delaware case law. *Collis*, 287 A.3d at 1218–20. The duty of loyalty is the core fiduciary principle, and when fiduciaries act disloyally or in bad faith, equitable tolling should still apply. *Id.* at 1219. Applied in this manner, the doctrine of equitable tolling resembles a similar tolling doctrine that permits a plaintiff to rely in blameless ignorance on the silence of professionals, where tolling is not artificially limited to self-dealing. *See Hillblom v. Wilm. Tr. Co.*, 2022 WL 17428978, at *11 (Del. Ch. Dec. 6, 2022). For equitable tolling, stockholders are relying on the silence of their professional fiduciaries.

53

The plaintiffs' claims invoke the duty of loyalty. The Information-Systems Claim and the Red-Flags Claim require an inference that the corporate fiduciaries consciously decided in bad faith that they would not take action to establish an information system or respond to red flags. The *Massey* Claim requires an inference that the corporate fiduciaries consciously decided in bad faith not to comply with the law, likely because of the cost of compliance and its impact on profits. Because each claim implicates the duty of loyalty, equitable tolling is available for all three.

The defendants never disclosed the existence of the DEA Settlement or their failure to fulfill its obligations. Equitable tolling consequently applies until the point of inquiry notice.

Applying the doctrine of equitable tolling is all the more warranted because the defendant fiduciaries reassured Walmart's stockholders that they were complying with their legal obligations. For example, in April 2013, while the DEA Settlement was in effect and the directors and officers were failing to meet its obligations, Walmart disclosed in its proxy statement that "Board committees, which meet regularly and report to the full Board, play active roles in fulfilling the risk oversight function."[22] In March 2014, the start of the last year of the DEA Settlement, Walmart publicly stated that it was "[c]reating a diversion analytics tool to deter, detect and remedy attempts at pharmaceutical diversion in U.S.

_____

[22] Wal-Mart Stores, Inc., Global Compliance Report on Fiscal Year 2014 (Mar. 14, 2014).

54

Walmart and Sam's Club pharmacies."[23]  In April 2015, just after the DEA Settlement expired, Walmart disclosed that, "management reported regularly to the Audit Committee regarding ongoing enhancements to our global compliance program and progress in implementing these objectives. At the end of fiscal 2015, the Audit Committee determined that, in its qualitative judgment, adequate progress had been achieved in implementing these objectives."[24] Similar disclosures appeared in Walmart's proxy statements for 2016, 2017, and 2018.[25]

More reassuring disclosures appeared in a press release from May 2018:

In an effort to continue to be part of the solution to our nation's opioid epidemic, Walmart is introducing new policies, programs and tools aimed at curbing opioid misuse and abuse. These initiatives apply to all Walmart and

[23] Compl. ¶ 352; Dkt. 40 at 51; *accord* Wal-Mart Stores, Inc., Definitive Additional Materials (Schedule 14A), at 9 (Apr. 23, 2014).

[24] Wal-Mart Stores, Inc., Definitive Proxy Statement (Schedule 14A), at 53 (Apr. 22, 2015).

[25] *See* Wal-Mart Stores, Inc., Definitive Proxy Statement (Schedule 14A), at 49–50 (Apr. 20, 2016) ("[O]ver the past few years, our company has made significant improvements to our ethics and compliance program around the world. To further emphasize our commitment to ethics and compliance, in early fiscal 2016, our company's senior leadership again developed a timetable for implementing further enhancements to our global ethics and compliance program on a prioritized basis. These objectives covered such subject matters as . . . health and wellness compliance . . . These objectives sought to enhance key elements of a corporate ethics and compliance program, including but not limited to developing and implementing enhanced compliance protocols and procedures, hiring and training of key compliance personnel, monitoring and assessment of various elements of the program, internal communications, and access to information."); Wal-Mart Stores, Inc., Definitive Proxy Statement (Schedule 14A), at 60 (Apr. 20, 2017) (same); Walmart Inc., Definitive Proxy Statement (Schedule 14A), at 51 (Apr. 20, 2018) (same).

> Sam's Club pharmacies and pharmacists in the United States and Puerto Rico.
>
> . . .
>
> Further, by the end of August 2018 . . . [i]n states that allow access, the company's pharmacists will have access to and use the controlled substance tracking tool, NarxCare. NarxCare is a tool that helps pharmacists make dispensing decisions and provides pharmacists with the real-time interstate visibility that currently exists.

Ex. H.

In contrast to these disclosures, the complaint alleges facts and points to internal documents that support an inference that Walmart failed to comply with the DEA Settlement. *See* Compl. ¶¶ 191, 211–214, 352. The complaint's factual allegations support an inference that while the DEA Settlement was in effect, Walmart's policies and operations hindered the ability of its pharmacists to track suspicious prescriptions and thwarted pharmacists' access to refusal-to-fill information. *Id.* ¶¶ 251–255.

It is reasonable to infer that Walmart's disclosures reassured stockholders, put them off the scent of wrongdoing, and reinforced their confidence in their fiduciaries. Because equitable tolling is available, laches based on the presumptive three-year statute of limitations does not apply.

### b. Inquiry Notice

The availability of a tolling doctrine does not end the analysis, because inquiry notice universally limits tolling. A plaintiff must sue within a reasonable time after the plaintiff "was objectively aware, or should have been aware, of facts giving rise to the

wrong." *Tyson Foods*, 919 A.2d at 585. "Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled." *Id.* Once the plaintiff is aware of the injury, or should have discovered it in the exercise of reasonable diligence, then the period for bringing a claim starts to run. *See Dean Witter*, 1998 WL 442456, at *6. Under a separate accrual system, if the ongoing conduct has stopped, then inquiry notice may prevent a plaintiff from invoking a tolling doctrine to save an otherwise untimely lawsuit.

> After a plaintiff is on inquiry notice, the plaintiff must sue within a reasonable time.
>
> Inquiry notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury.

*Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005). "Inquiry notice does not require a plaintiff to have actual knowledge of a wrong, but simply an objective awareness of the facts giving rise to the wrong—that is, a plaintiff is put on inquiry notice when he gains possession of facts sufficient to make him suspicious, or that ought to make him suspicious." *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *7 (Del. Ch. Jan. 27, 2010) (cleaned up). When a plaintiff has relied upon a fiduciary's statements, then inquiry notice does not arise unless the plaintiff had some reason to suspect that the fiduciary's statements were inaccurate. *Tyson Foods*, 919 A.2d at 600.

57

As with the application of timeliness defenses more generally, the issue of inquiry notice may not be suitable for resolution on a motion to dismiss. "[T]he question of inquiry notice is factually-intensive [sic] and case-specific." *Bredberg v. Boston Sci. Corp.*, 2021 WL 2816897, at *5 (Del. Super. Ct. July 2, 2021). In some cases, it may be possible to determine at the pleading stage that a plaintiff was on inquiry notice; in others, that determination must await further developments. *Id.*

The defendants argue that the plaintiffs were on inquiry notice in 2017 after the filing of the bellwether complaints in the Opioid MDL. It is fair to infer that the complaints in the Opioid MDL put stockholders on notice of problems with Walmart's compliance with the Controlled Substances Act. But the extent to which the Opioid MDL put stockholders on notice of Walmart's years of non-compliance with the DEA Settlement is not clear from the face of the complaint. Failing to comply with a regulatory statute like the Controlled Substances Act is a problem. Failing to comply with the specific obligations in a settlement agreement between a company and its principal regulator is a bigger problem. Inquiry notice about the former need not result in inquiry notice about the latter.

The two complaints in the Opioid MDL that the defendants cite do not contain references to the DEA Settlement. The Cabell County Commission filed the first complaint in March 2017 in the U.S. District Court for the Southern District of West Virginia against Walmart in its capacity as a distributor and against other distributors, collectively referred to as the "Distributor Defendants." Ex. 57. The Cabell County complaint alleged that

58

Walmart failed to meet its obligations as a distributor to "maintain effective controls against diversion of prescription opiates" and "monitor, detect, investigate, refuse and report suspicious orders of prescription opiates." *Id.* ¶¶ 81, 87. The Cabell County complaint identified orders to show cause that the DEA issued against AmerisourceBergen and Cardinal Health, and settlement agreements between the DEA and McKesson and Cardinal Health. The complaint did not identify the 2007 order to show cause against Walmart or the 2011 DEA Settlement. That is not surprising. The order to show cause and the DEA Settlement addressed Walmart's obligations as a dispenser, not a distributor, and Walmart had never disclosed the existence of the DEA Settlement.

The Cherokee Nation filed the second complaint in April 2017 in the District Court of the Cherokee Nation against three "Distributor Defendants"—McKesson, Cardinal Health, and AmerisourceBergen—and three "Pharmacy Defendants"—CVS, Walgreens, and Walmart. Ex. 58 ¶¶ 12–17. The complaint alleged that the Pharmacy Defendants "engaged in improper dispensing practices" and "participated in nuisance-causing activities," including "failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances" and "failing to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances." *Id.* ¶¶ 177–181. In its Walmart-specific allegations, the complaint alleged:

> Walmart has had two orders entered against it and its employees. In January of 2015, Walmart was cited for "failing to have a pharmacy manager who

59

established and maintained effective controls against the diversion of prescription drugs and failing to have a pharmacy manager who supervises employees as they related to the practice of pharmacy." Notably, this particular Walmart is not only within the Cherokee Nation, but is also number eight on the top-ten list of opioid dispensing pharmacies in Oklahoma. Then, on June 15, 2016, a pharmacy technician employed by Walmart in Broken Arrow, Oklahoma had an order entered against her and her license revoked stemming from diversion of prescription opioids.

*Id.* ¶ 160. The complaint did not identify the 2007 order to show cause against Walmart or the 2011 DEA Settlement, even though the complaint extended to Walmart's activities as a dispenser.

The allegations in these complaints do not contain anything that would have put stockholders on the trail of the DEA Settlement. The allegations in the complaints also did not contain allegations about board-level compliance and oversight. It is not clear at this stage of the case that the complaints that the defendants have cited from the Opioid MDL constituted inquiry notice for claims relating to the DEA Settlement Issues.

Inquiry notice also requires the court to have confidence that the plaintiff could have discovered the claim if the plaintiff had caught the scent.

Determining when a stockholder plaintiff is on inquiry notice for a claim that otherwise would survive a motion to dismiss therefore involves a two-step analysis. First, sufficient information must be available to arouse a reasonable stockholder's suspicions. Second, the reasonable stockholder must be able to commence an investigation and discover the facts necessary to plead the claim and survive the motion to dismiss. If the stockholder could not obtain the information necessary to file a viable complaint, then the stockholder could continue to rely reasonably on the competence and good faith of the fiduciary, and equitable tolling would continue to apply.

*In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, at *12 (Del. Ch. Dec. 20, 2013).

60

It is not clear at this stage of the case whether the plaintiffs could have obtained information about the DEA Settlement if they had served demands for books and records in 2017 that did not identify the DEA Settlement specifically. To obtain the DEA Settlement, the plaintiffs would have had to request records going back six years, which is a time period that respondents often resist. Courts are aware of the burden that books and records requests can impose on a responding corporation, and it is not clear that a court would have gone beyond five years without a good reason for doing so.

The court cannot determine from the face of the complaint whether the plaintiffs were on inquiry notice before the publication of the *Pro Publica* article in March 2020. At this stage of the case, it appears that equitable tolling is available for the DEA Settlement Issues until March 2020, which means that the plaintiffs have advanced timely claims. At a later stage of the case, it may become apparent that the plaintiffs were on inquiry notice at an earlier date. At present, the defendants cannot rely on inquiry notice to render the plaintiffs' claims untimely.

## E.    Prejudice To The Defendants

A second dimension of the laches analysis is prejudice to the defendants. "Laches is fundamentally concerned with the prevention of inequity in permitting a claim to be enforced. Inequity for this purpose arises where there occurs some change in the condition or relation of the parties or the property involved in the pending lawsuit." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate & Commercial Practice in the Delaware Court of Chancery* § 15.07[c][4], at 15-18 (2021). The defendants have not pointed to any prejudice

61

that could render the plaintiffs' suit untimely. They made a straightforward statute of limitations argument, which this decision has rejected.

If anything, now is the appropriate time to litigate the case. In November 2022, Walmart announced that it had agreed to a $3.1 billion settlement. The bulk of the harm to Walmart has now been quantified, and the time has come to consider whether grounds exist to shift responsibility for the harm to the individuals who made decisions on its behalf.

## F.    Other Equitable Considerations

When conducting a laches analysis, a court may take into account "unusual conditions or extraordinary circumstances."[26] There are none in this case.

## III.    CONCLUSION

To the extent that the defendants have moved to dismiss the plaintiffs' claims on the grounds of untimeliness, their motion is denied.

---

[26] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 770; *accord IAC/InterActiveCorp. v. O'Brien*, 26 A.3d 174, 178 (Del. 2011) (same); *Wright v. Scotton*, 121 A. 69, 73 (Del. 1923) ("[I]f unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute [a court] will determine the extraordinary case in accordance with the equities which condition it.").